UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| CONSERVATION LAW FOUNDATION, INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 3:22-cv-00454-JBA |
| ) | |
| FIRST TRANSIT, INC. ) | |
| ) | |
| Defendant. ) | |

## CONSENT DECREE

WHEREAS, Plaintiff Conservation Law Foundation ("CLF" or "Plaintiff") filed this action

on March 28, 2022 against First Transit, Inc. ("First Transit" or "Defendant");

WHEREAS, Plaintiff is a non-profit environmental organization incorporated in

Massachusetts;

WHEREAS, Defendant is a transportation company operating in the State of Connecticut;

WHEREAS, Plaintiff alleges in its complaint that Defendant idled motor vehicles in

violation of the Clean Air Act, 42 U.S.C. §§ 7401 *et seq.* ("CAA") and the Connecticut motor

vehicle idling requirements contained within the federally enforceable Connecticut State

Implementation Plan, Reg. Conn. State Agencies § 22a-174-18(b)(3)(C), and sought civil

penalties, injunctive relief, and Plaintiff's attorneys' fees and costs of litigation;

WHEREAS, Plaintiff and Defendant (collectively the "Parties") have negotiated this Consent

Decree in good faith and at arm's length, and agree that the settlement of the above-captioned

action (the "Action") through this Consent Decree without further litigation is in the public

interest, and is a fair, reasonable, and appropriate means of resolving all claims in the Action;

WHEREAS, the Parties anticipate that this Consent Decree will enhance public health and the environment by improving air quality in the State of Connecticut;

WHEREAS, the Plaintiff and Defendant each consent to the entry of this Consent Decree without further trial, argument or appeal;

WHEREAS, pursuant to 42 U.S.C. § 7604(c)(3), this Consent Decree is being forwarded to the United States Department of Justice and to the United States Environmental Protection Agency ("EPA") for the forty-five (45) day review period mandated by the CAA;

WHEREAS, the Defendant does not admit to any specific factual and legal allegations herein, except as provided in Section I (Jurisdiction and Venue), below;

NOW, THEREFORE, before the taking of any testimony, without the adjudication of any issue of fact or law, and with the consent of the Parties,

IT IS HEREBY ADJUDGED, ORDERED, AND DECREED as follows:

## I.    JURISDICTION AND VENUE

1.    This Court has jurisdiction over this action, the subject matter herein, and over the Parties consenting hereto, pursuant to 42 U.S.C. § 7604(a) and 28 U.S.C. § 1331.

2.    Venue properly lies in this Court and district pursuant to 42 U.S.C. § 7604(a) and 28 U.S.C. § 1331 because the violations alleged in the Complaint occurred in this district and the Defendant conducts business in this district.

3.    Plaintiff gave Defendant notice by a letter (the "Notice Letter") of the violations alleged in the Complaint more than sixty (60) days prior to commencement of this lawsuit. Copies of the Notice Letter were also mailed to the Administrator of the EPA, the Regional Administrator of the EPA for Region 1, the Connecticut Department of Energy & Environmental Protection ("DEEP"), and the EPA Citizen Suit Coordinator. Neither EPA nor DEEP commenced any action prior to Plaintiff's filing of the Complaint.

2

4.     Solely for the purpose of this Consent Decree and the underlying Complaint, and any action to enforce this Consent Decree, Defendant consents to this Court's jurisdiction and to venue in this judicial district. Defendant consents to and shall not challenge entry of this Consent Decree or this Court's jurisdiction to enter and enforce this Consent Decree. Except as provided herein, this Consent Decree shall not directly create any rights in or obligations of any Party other than the Parties to this Consent Decree.

5.     This Court shall retain jurisdiction over this case until the Termination Date for the purpose of resolving disputes arising under this Consent Decree or entering orders modifying this Consent Decree, pursuant to Sections X (Enforcement), XI (Dispute Resolution) and XV (Modification), or effectuating or enforcing compliance with the terms of this Consent Decree.

## II.     APPLICABILITY

6.     Upon the Effective Date, the obligations of this Consent Decree shall apply to, and be binding upon, Plaintiff and Defendant, and any successors, assigns, or other entities or persons otherwise bound by law.

7.     The terms of this Consent Decree shall remain in full force and effect following Transdev North America, Inc.'s acquisition of First Transit.

8.     This Consent Decree, unless otherwise indicated, shall apply solely to Defendant's CTDOT Contract and the Yale University Contract.

## III.     DEFINITIONS

9.     Terms used in this Consent Decree that are defined in the CAA or in regulations promulgated by EPA and DEEP pursuant to the Act shall have the meanings assigned to them in the Act or such regulations, unless otherwise provided in this Consent Decree. All references to a duration of "days" shall be calendar days unless otherwise specified. Whenever the terms set forth below are used in this Consent Decree, the following definitions shall apply:

a.    "Air Pollution Mitigation Projects": Projects that will reduce air pollution and improve the environment in New Haven and Wethersfield, particularly in the neighborhoods where Defendant runs its bus routes. These projects will be implemented pursuant to the terms provided in Exhibit A.

b.    "CTDOT Contract": Defendant's transportation services agreement with the Connecticut Department of Transportation effective January 1, 2016.

c.    "Effective Date": The date upon which the Consent Decree is entered by the Court or a motion to enter the Consent Decree is granted, whichever occurs first, as recorded in the Court's docket.

d.    "Idling Enforcement Officer" (IEO): An officer designated by First Transit to carry out the obligations set forth in Section V(A) (Compliance Monitoring Measures, Idling Enforcement).

e.    "Implementing Organization": Each of the third-party entities implementing the Air Pollution Mitigation Projects described in Exhibit A of this Consent Decree.

f.    "Independent Auditor": A mutually selected independent third party, retained pursuant to the Independent Auditor Agreement.

g.    "Independent Auditor Agreement": Enforceable private contract between the Parties and the Independent Auditor governing the retention, duties, reporting, and payment of the Independent Auditor.

h.    "Termination Date": The date on which the Consent Decree term ends. Five (5) years after the Effective Date pursuant to Section XIV (Effective Date and Termination).

i.    "Yale University Contract": Defendant's current transportation services agreement with Yale University effective November 1, 2015.

## IV.    COMPLIANCE MEASURES

A.    Anti-Idling Policy

10.    First Transit-operated vehicles in the State of Connecticut shall comply with the State of Connecticut Idling Regulation, Regs. Conn. State Agencies § 22a-174-18(b)(3)(C).

11.    Defendant shall review and update its written anti-idling policy for its operations under the Yale University Contract, which shall conform to the law and explicitly prohibit vehicle idling that exceeds three (3) minutes in violation of Regs. Conn. State agencies § 22a-174-18(b)(3)(C), unless otherwise exempted by applicable law.

12.    Defendant shall include in its written anti-idling policy the following:

a.    Explanations of the negative health effects of idling and vehicle exhaust; and

b.    Strategies for idling cessation.

13.    Defendant shall add the updated anti-idling policy to its employee handbook for employees providing service under the Yale University Contract, which shall be annually distributed to those operators and supervisors either via email or in print.

14.    Defendant shall provide the anti-idling policy to new operators and supervisors under the Yale University Contract and require those operators and supervisors to sign an acknowledgment of the anti-idling policy.

15.     The updated anti-idling policy and any other anti-idling materials shall be translated into languages other than English when it is determined that applicable personnel have limited English proficiency.

B.     Signs and Training

16.     Defendant shall place and maintain clearly visible "No Idling" stickers or signs in the operator's seat area of each First Transit-operated bus that provides service under the Yale University Contract, unless prohibited by applicable law, service agreement, or customer, or if it would otherwise compromise a vehicle warranty as qualifying as an after-market modification.

17.     Defendant shall require that vehicle operators under the Yale University Contract receive annual anti-idling training.

18.     Defendant shall require that every new or re-hired operator receive anti-idling training within sixty (60) days of hiring or re-hiring, unless such operator is re-hired within six (6) months of separation, in which case no retraining will be required.

19.     The anti-idling training for the newly hired or re-hired operators and the annual training for all operators shall be at least thirty (30) minutes in length.

20.     Defendant shall deliver training materials as a pamphlet, operator handbook insert, video instruction, or online training module.

21.     Training materials shall be translated into languages other than English when it is determined that applicable personnel have limited English proficiency.

22.     Defendant shall include anti-idling content in all regularly scheduled safety trainings that are provided to operators providing service under the Yale University Contract and shall, at a minimum, include at least one (1) anti-idling message per week during safety briefings or other operator communications.

23.     Defendant shall offer additional trainings upon request of personnel or as deemed

necessary by First Transit management.

24.     All anti-idling trainings shall address, at minimum, the following topics:

    a.     The Connecticut idling regulation, Regs. Conn. State Agencies § 22a-174-

        18(b)(3)(C), including exemptions, Regs. Conn. State Agencies § 22a-

        174-18(b)(3)(C)(i)-(vii);

    b.     Strategies for avoiding idling, including elimination of unnecessary idling

        during pre- and post-trip inspections, while loading and unloading new

        passengers, and excessive heating or cooling during cold or hot weather;

        and

    c.     The negative health effects of idling and vehicle exhaust.

25.     Trainings shall be conducted in languages other than English when it is

determined that training attendees have limited English proficiency.

## C.     Intervention for Idling Operators

26.     Defendant shall maintain documentation of idling and create metrics to identify

operators who are excessively idling. First Transit operators who do not comply with the idling

regulation shall be required to attend additional anti-idling trainings and shall be monitored for

compliance at least one (1) week following the completion of that training.

27.     Operators found idling for three (3) minutes or longer on three (3) or more

occasions in two (2) weeks shall be disciplined, required to attend additional trainings, and

supervised or monitored for compliance, unless otherwise exempted by applicable law or

prohibited by or inconsistent with the existing collective bargaining agreement.

## D.     Encouragement of Transition to Electric Vehicles

28.     For each Request for Proposal ("RFP") that Defendant responds to in the State of Connecticut, both for new contracts and renewals of existing contracts, Defendant shall include language encouraging a transition to electric vehicles, unless the applicable RFP states that alternative proposals (including but not limited to encouraging transition to electric vehicles) may not be included in Defendant's proposal.

## V.     COMPLIANCE MONITORING MEASURES

A.     Idling Enforcement

29.     Defendant shall designate at least one Idling Enforcement Officer ("IEO") to monitor operators' compliance with the anti-idling policy at the Yale School of Medicine Shuttle Stop, located at 333 Cedar Street in New Haven, Connecticut, 06519.

30.     The IEOs shall conduct unannounced weekly field checks of the buses at this location. The unannounced field checks will take place between the hours of 12:00 pm and 3:00 pm.

31.     The IEOs shall instruct operators who are excessively idling to immediately stop.

32.     In cases where an operator is absent from the bus, the IEO shall shut off buses found idling, unless deemed unsafe or prohibited by customer or law. If the IEO is unable to shut off the bus for the above-stated reasons they will immediately attempt to locate the absent operator and instruct them to shut off the bus.

33.     The IEO shall identify and document operators who idle for three (3) minutes or longer, including operators who idle for three (3) minutes or longer more than three (3) times in a two-week period.

B.     Independent Audits

34.     Defendant shall pay for an Independent Auditor, mutually agreeable to the Parties as set forth in the Independent Auditor Agreement, who will conduct up to twenty (20) unannounced audits during the Term of this Consent Decree at the Yale School of Medicine Shuttle Stop. The Independent Auditor shall conduct no more than six (6) audits during the first year of the Consent Decree term.

35.     As provided in the Independent Auditor Agreement, the Independent Auditor shall complete a report within one (1) week of each audit. The report will be made available to both parties upon request by either party.

## VI.     REPORTING

36.     Defendant shall submit semiannual Compliance Reports to Plaintiff until the Termination Date. Each Compliance Report, except the final Compliance Report, shall include information regarding the prior six-month period and shall be submitted within forty-five (45) days of the last day of that six-month period. The first Compliance Report shall cover the period from the Effective Date until six (6) months following the Effective Date and shall be submitted within forty-five (45) days of the last day of that six-month period. Subsequent Compliance Reports shall be submitted every six (6) months thereafter and cover the preceding six-month period. The final Compliance Report shall include information regarding the last six-month period of the Consent Decree term and shall be submitted by the Termination Date.

37.     The Compliance Reports shall include a description of Defendant's implementation of the measures contained in Paragraphs 26, 27, and 29-33 (Intervention for Idling Operators and Idling Enforcement). The first Compliance Report shall include a copy of Defendant's updated anti-idling policy in accordance with Paragraph 12. In the final Compliance Report of each calendar year, Defendant shall identify the requests for proposals for both new

and existing contracts that it responded to in the State of Connecticut during that calendar year
where Defendant's response included language encouraging a transition to electric vehicles.

38.     Defendant shall maintain records of all the field checks, disciplinary actions, and
related training and provide them to CLF within fifteen (15) business days of any request for
them.

## VII.   PAYMENTS

A.     <u>Civil Penalty</u>

39.     Within thirty (30) days of the Effective Date, Defendant shall pay to the United
States Department of Treasury a civil penalty of $10,000. Failure to timely send payment of the
civil penalty to the United States Department of Treasury shall subject Defendant to interest
accruing from the date payment is due until the date payment is sent at the rate prescribed by 28
U.S.C. § 1961 and shall render Defendant liable for all charges, costs, fees, and penalties
established by law for the benefit of a creditor or of the United States in securing payment.

B.     <u>Stipulated Payments</u>

40.     Defendant shall be liable for stipulated payments for each vehicle and each
occurrence of idling in excess of three (3) minutes as recorded by the IEO or the Independent
Auditor.

41.     The accrual, payment, and dispute of stipulated payments shall be governed by
Paragraphs 40-44, the procedures set forth below in Section X (Enforcement), and the
Independent Auditor Agreement.

42.     Stipulated payments for excess idling:

      a.     $500 per vehicle per occurrence for 1 to 10 minutes of excess idling;

      b.     $750 per vehicle per occurrence for 11 to 20 minutes of excess of idling;

      c.      $2,000 per vehicle per occurrence for 21 to 40 minutes of excess idling;

      d.      $3,000 per vehicle per occurrence for 41 to 60 minutes of excess idling; and

      e.      $6,000 per vehicle, per occurrence for 61 minutes or more of excess idling.

43.      Other stipulated payments:

      a.      $500 for each unperformed or improperly staffed field check;

      b.      $500 for each undocumented field check ;

      c.      $1,000 for failure to meet annual operating training requirement;

      d.      $1,000 for failure to retain documentation;

      e.      $1,000 for failure to provide documentation upon request; and

      f.      $1,500 per week for failure to provide semiannual compliance reports.

44.      All stipulated payments for excess idling shall be split evenly between and paid to the Implementing Organizations within thirty (30) business days of each report of idling from the IEO or Independent Auditor. All other stipulated payments shall be split evenly between and paid to the Implementing Organizations within thirty (30) business days of the last day of each calendar quarter.

C.     <u>Air Pollution Mitigation Project</u>

45.      Defendant shall pay a total of $725,000 to fund Air Pollution Mitigation Projects pursuant to the terms provided in Exhibit A. The $725,000 shall be distributed to the following recipients on the following schedule:

      a.      One payment of $362,500 to Gather New Haven ("Gather") on or before thirty (30) days following the Effective Date.

b.      One payment of $362,500 to Connecticut Coalition for Environmental Justice ("CCEJ") on or before thirty (30) days following the Effective Date.

46.      Defendant shall not deduct any penalties paid under Section VII (Payments) in calculating its federal, state, or local income tax.

47.      Each Implementing Organization will submit to the Parties, pursuant to the notice provision in Section XIII (Notices), annual status reports due each year on the anniversary of the payment deadline in Paragraph 45 while funds are being spent. The status reports will include, at a minimum, the following information: (i) description of activities completed to date and related expenditures of Project Funds and (ii) a discussion of any anticipated changes to the scope or timeline of the Mitigation Projects.

D.      Costs of Litigation

48.      Consistent with 42 U.S.C. § 7604(d), within forty-five (45) days of the Effective Date, Defendant shall pay $133,552.50 by company check to Plaintiff, which shall resolve all claims for attorneys' fees, costs of litigation, or other expenses.

49.      In the event that any payment of attorneys' fees and costs of litigation owed by the Defendant under Paragraph 48 are not made on or before the due date, Plaintiff shall provide written notice to Defendant of such failure to pay on or by the due date. Defendant shall have ten (10) business days from the date of Plaintiff's notice to make payment.

E.      Late Fees

50.      The Defendant shall pay $500 per day for any payments made pursuant to this Consent Decree that are more than thirty (30) calendar days late. Payments shall be made within fifteen (15) days of the failure to meet the deadline. Late fees for the late payment of Plaintiff's

fees and costs shall be paid to Plaintiff. All other late fees shall be paid to the Implementing

Organizations on an equal basis.

## VIII.   PUBLICITY

51.    Any public statement made by Defendant in any press release, in any oral or

written material promoting Defendant's environmental or charitable practices or record, or in

Defendant's Annual Reports, that refers to Defendant's payments or other financial obligations

under Section VII (Payments), shall include the following language or language materially

similar to the following: "Payments were made pursuant to the settlement of a Clean Air Act

lawsuit brought by Conservation Law Foundation" or "Payments to the organizations were made

pursuant to the settlement of a Clean Air Act lawsuit brought by Conservation Law Foundation."

## IX.   FORCE MAJEURE

52.    "Force Majeure," for purposes of the Consent Decree, is defined as any event

arising from causes beyond the control of Defendant, of any entity controlled by Defendant, or

Defendant's contractors, that delays or prevents the performance of any obligation under the

Consent Decree despite Defendant's best efforts to fulfill the obligation. Force Majeure events

shall include but are not limited to: war or violent uprisings, natural disasters, labor strikes,

transport delays, civil unrest, a declared state of emergency, and any public health concerns

(which shall include without limitation the COVID-19 pandemic). The requirement that

Defendant exercise best efforts to fulfill the obligation includes using best efforts to anticipate

any potential Force Majeure event and best efforts to address the effects of any such event (a) as

it is occurring and (b) after it has occurred to prevent or minimize any resulting delay or non-

performance during such event to the greatest extent possible. Force Majeure does not include

Defendant's financial inability to perform any obligation under this Consent Decree.

Unanticipated or increased costs or expenses associated with the performance of Defendant's

obligations under this Consent Decree shall not constitute circumstances beyond Defendant's control, nor serve as the basis for an extension of time under this Section and shall not constitute an event of Force Majeure.

53.     If any event occurs or has occurred that may delay or prevent compliance with the performance of any obligation under this Consent Decree, as to which Defendant intends to assert a claim as an event of Force Majeure, Defendant shall provide written notice to Plaintiff of such claim in accordance with Section XIII (Notices), as soon as practicable but no later than thirty (30) days following the date on which Defendant first had notice that the claimed Force Majeure event may cause such delay or impediment and give rise to a claim of Force Majeure. Upon providing notice of Force Majeure, Defendant's time for performance of the obligations under this Consent Decree that are affected by the Force Majeure will be extended as necessary to complete those obligations, or the obligations will be eliminated if performance is no longer possible.

## X.     ENFORCEMENT

54.     The Court shall retain jurisdiction over this case until the termination of the Consent Decree to enforce the terms and conditions of the Consent Decree, to modify the Consent Decree, and to resolve any disputes arising hereunder.

55.     In the event Defendant fails to comply with any provision of the Consent Decree, Plaintiff may seek to enforce the Consent Decree by motion in this case.

## XI.     DISPUTE RESOLUTION

56.     All disputes related to the stipulated payments for excess idling shall be subject to the binding dispute resolution process as described herein.

57.     Within thirty (30) days of the Effective Date, the Parties shall mutually select a neutral third party to make a binding determination during any dispute resolution process related to excess idling (the "Arbitrator").

58.     Each Party has the right to dispute a determination made by the Independent Auditor with respect to excess idling except that Plaintiff is limited to initiating five (5) such disputes during the Term of this Consent Decree; no numeric limit applies to the number of disputes initiated by Defendant. If a Party disputes any determination made by the Independent Auditor with respect to excess idling, or the applicability of stipulated payments to any event or claim of excess idling (the "Disputing Party"), then that Party has the right to initiate the following process with the other Party (the "Non-Disputing Party").

a.   The Disputing Party has seven (7) days after receipt of any report by the Independent Auditor to inform the Non-Disputing Party that it will be disputing one or more instances of idling designated as excess idling by the Independent Auditor's report.

b.   The Disputing Party has twenty-one (21) days after receipt of the Independent Auditor's report to investigate and provide to the Non-Disputing Party any documentation indicating that the disputed idling event(s) was not excess idling.

c.   The Non-Disputing Party shall review the documentation provided by the Disputing Party and respond within twenty-one (21) days.  Such response shall indicate whether the Non-Disputing Party agrees with the Disputing Party's assessment of the disputed idling event.

d.   If the Parties remain in disagreement regarding excess idling event(s) following the Non-Disputing Party's response, either Party has the right to appeal the

Independent Auditor's report to the Arbitrator within ten (10) days of the Non-Disputing Party's response.

e.  Each Party has the right (but is not required) to submit a statement, not to exceed two pages per idling event, to the Arbitrator within fifteen (15) days of any such appeal.

f.  The Arbitrator shall review:

   i.  Each Party's statement, if any;

   ii.  The report of the Independent Auditor and any related documents or information provided by the Independent Auditor; and

   iii.  The documentation previously submitted to Plaintiff by Defendant.

59.     The Arbitrator shall issue a written, binding, and non-appealable determination simultaneously to both Parties as to whether the disputed instance(s) do or do not constitute excess idling.

60.     The non-prevailing Party of any dispute resolution process shall pay all costs related to the Arbitrator for that given dispute. If a Party partially prevails, the other Party shall pay costs on a pro rata basis. For example (and by way of example only), if a Party appeals three excess idling events and prevails on two of those events, the non-prevailing Party should pay 2/3 of the costs related to the Arbitrator with remaining costs borne by the non-prevailing Party. Similarly, for example (and by way of example only), if Party A appeals three excess idling events and Party B appeals two excess idling events, all related to the same Independent Auditor report, and both parties prevail in all of their appeals, Party B would pay 3/5 of the costs related to the Arbitrator while Party A would pay 2/5 of those costs. Each Party shall bear its own legal fees and internal costs related to the dispute resolution process as described in this Section XI.

61.     Stipulated payments for excess idling events affirmed by the Arbitrator shall be payable by Defendant within thirty (30) days of the issuance of the Arbitrator's written determination with respect to the applicable excess idling events.

## XII.   EFFECT OF SETTLEMENT

62.     Entry of this Consent Decree shall resolve any and all claims, causes of action, or liability arising under the CAA and Connecticut State law brought by the Plaintiff against the Defendant for damages, penalties, fines, injunctive relief, past and future attorney's fees, past and future costs, or any other claim or relief relating to the violations that were alleged, or could have been alleged, in the Complaint or in this action; Plaintiff covenants not to sue, releases, and forever discharges Defendant from all such claims, causes of action, or liabilities arising on or before the Effective Date.

63.     Plaintiff covenants not to sue and shall not bring any claim, cause of action, or suit against Defendant for any alleged violations of the same nature or type as those described in the Complaint that occur prior to the Termination Date; Plaintiff's exclusive remedy and recourse for any such claims against Defendant, or other claims related to violations of Connecticut idling laws or regulations arising after the Effective Date and prior to the Termination Date shall be through the stipulated payments described in the Consent Decree.

64.     The Consent Decree shall not be construed to create rights in, or grant any cause of action to, any third party not party to the Consent Decree.

## XIII.  NOTICES

65.     Unless otherwise provided herein, whenever notifications, submissions, or communications are required by the Consent Decree, they shall be made in writing and addressed as follows:

For Plaintiff:
Ethan Hsi/CAW Paralegal
Conservation Law Foundation
62 Summer St.
Boston, MA 02110
ehsi@clf.org

For Defendant:
Mathew Todaro
Verrill Dana LLP
355 Riverside Avenue
Westport, CT 06880
mtodaro@verrill-law.com

66.     Any Party may, by written notice to the other Party, change its designated notice recipient, address, or means of transmittal provided above.

67.     All notifications, communications, or submissions made pursuant to this Section shall be sent by electronic mail. Any Party planning a communication by nonelectronic means should first attempt to contact the opposing Party to confirm the appropriate mailing address.

## XIV.   EFFECTIVE DATE & TERMINATION

68.     The Effective Date of this Consent Decree shall be the date upon which this Consent Decree is entered by the Court or a motion to enter the Consent Decree is granted, whichever occurs first, as recorded on the Court's Docket ("Effective Date"). All obligations arising under the Consent Decree shall become effective as of the Effective Date.

69.     Defendant's CTDOT Contract terminated on December 31, 2022 and all Consent Decree obligations relating specifically to that agreement terminated on January 1, 2023. The Consent Decree obligations for Defendant's Yale University Contract shall remain in effect for five (5) years after the Effective Date, as long as Defendant maintains the Yale University

Contract. Defendant shall not be required to produce any data or information regarding anything beyond the Termination Date.

## XV.    MODIFICATION

70.     The terms of the Consent Decree may be modified only by subsequent written agreement signed by the Parties. Where the modification constitutes a material change to any term of the Consent Decree, it shall be effective only upon approval by the Court.

## XVI.   SIGNATORIES/SERVICE

71.     Each undersigned representative of the Parties certifies that they are fully authorized to enter into the terms and conditions of the Consent Decree and to execute and legally bind the Party they represent to this document.

## XVII.  INTEGRATION

72.     The Consent Decree constitutes the final, complete, and exclusive agreement and understanding among the Parties with respect to the settlement embodied in the Consent Decree and supersedes all prior agreements and understandings, whether oral or written, concerning the settlement embodied herein.

## XVIII. FINAL JUDGMENT

73.     Upon approval and entry of the Consent Decree by the Court, the Consent Decree shall constitute a final judgment of the Court as to the Plaintiff and the Defendant.

## SIGNATURE PAGE

**Conservation Law Foundation, Inc.**

By: _____        Date: <u>5/19/2023</u>

Heather A. Govern
Conservation Law Foundation
62 Summer Street
Boston, MA 02110

**First Transit, Inc.**

By: _____        Date: 6/5/23

Dated and entered this ___ ___Day of _____, _____.

_____
United States District Court Judge

## EXHIBIT A: MITIGATION PROJECT DESCRIPTIONS

A.     **Mitigation Project 1: Urban Farming Educational Programming and Outreach and Urban Farm Site Development**

1.     <u>Implementing Organization</u>: Gather New Haven, Inc. (Gather or GNH)

2.     <u>Project Funds</u>: $362,500

3.     <u>Description</u>: This Mitigation Project will include the following components:

a.     Gather will expand urban farming throughout New Haven by providing gardening beds, education, and support to a variety of communities. Gather will support and partner with forty community gardens and five schools to provide beds for community members and students, and teach and assist the community members, schools, and students in the practice of growing food. Gather will partner with at least four libraries to teach community members and students about the practice of growing food. Gather will help build and restore raised garden beds across its Community Garden network in New Haven (providing wood, soil, bio barriers, seedlings, and seeds) with volunteer and student intern support. Gather will test a program to provide raised beds on legs for seniors and/or individuals with disabilities. Gather will purchase an electric or hybrid farm truck for produce and materials transport.

b.     Gather will maintain and expand their resources for teaching members of the community how to grow food and prepare the food they have grown, creating capacity and demand for community members to participate in urban farming.

c.     Gather will analyze the acquisition and development of an additional parcel of land for urban agriculture to replace one of its leased farms where the host commercial property is being sold. Once developed, this farm site will

contribute produce to Gather's Farm-Based Wellness Program and Gather's community food distribution program.

d.      Gather will implement infrastructural improvements to its Ferry Street and Ward Street farm sites located in New Haven.

4.      Projected Air Quality Benefits: Urban agriculture can help to improve air quality through a variety of direct and indirect methods. Urban vegetation can actively clean the air, as existing air pollutants can also be filtered from the air by adhering to plant surfaces and by direct absorption into the plant. Urban vegetation can help curb pollutant emissions by providing more fresh produce grown locally in urban environments, reducing food crop transportation needs and directly resulting in a reduction of truck emissions. Urban vegetation can also create a cooling effect in the urban environment by blocking incoming solar radiation, dispersing light reflected from urban surfaces, providing shade, and releasing cooling water vapor into the atmosphere. This cooling effect reduces the need for air conditioners and other polluting cooling mechanisms, while also reducing heat-dependent, pollutant-producing chemical reactions in the atmosphere. Replacing one conventional truck with an electric truck will reduce harmful emissions.

**B.      Mitigation Project 2: Air Quality Monitoring**

1.      Implementing Organization: Connecticut Coalition for Environmental Justice (CCEJ)

2.      Project Funds: $362,500

3.      Description: This Mitigation Project will include the following components:

a.      CCEJ will enhance ambient air monitoring of pollutants at locations throughout Wethersfield and New Haven, including in environmental justice communities and near major roadways. CCEJ will install air monitors that measure harmful air pollutants, including nitrogen oxides, carbon monoxide, and particulate matter.

b.      Implementation of the project will include the following components: the hiring of staff, the purchase and installation of air monitors, curriculum and training materials development, community outreach, community trainings, data analysis, and the publication of air quality findings.

4.      Projected Air Quality Benefits: Ambient air monitoring in Wethersfield and New Haven will provide numerous air quality benefits, including the following: 1) an assessment of air quality and whether it meets national standards; 2) identification of areas with the highest air pollution levels; 3) air pollution data for the community; 4) an evaluation of the effectiveness of existing air pollution control strategies; 5) information on air quality trends; 6) data for the evaluation of air quality models; and 7) support for research, including studies of the health effects of air pollution.